UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NARCISO T. MORALES,<br><br>　　　　Petitioner,<br><br>　v.<br><br>WILLIAM MUNIZ, Warden,<br><br>　　　　Respondent. | No. 1:16-cv-00466-DAD-JLT (HC)<br><br>**FINDINGS AND RECOMMENDATION TO DENY PETITION FOR WRIT OF HABEAS CORPUS**<br><br>**[TWENTY-ONE DAY OBJECTION DEADLINE]** |

Petitioner is currently serving a determinate sentence of 63 years and 4 months for his conviction of multiple counts of assault with a firearm on a peace officer and numerous weapon possession charges. In this petition, Petitioner claims the evidence was insufficient to support the convictions. As discussed below, the Court finds the claim to be without merit and recommends the petition be **DENIED.**

**I.　　PROCEDURAL HISTORY**

Petitioner was convicted in the Madera County Superior Court on August 23, 2013, of: five counts of assault with a firearm on a peace officer (Cal. Penal Code §§ 245(d)(1), 12022.5(a), 12022.53(b)); five counts of obstruction of an executive officer involving the personal use of a firearm (Cal. Penal Code §§ 69, 12022.5(a)); one count of possession of a firearm by a person previously convicted of a specified misdemeanor (Cal. Penal Code § 29805); two counts of possession of ammunition by a person prohibited from possessing a firearm (Cal. Penal Code §

1

30305(a); two counts of possession of an assault weapon (Cal. Penal Code § 30605); and one count of possession of shurikens (Cal. Penal Code § 22410). People v. Morales, No. F068205, 2015 WL 4141840, at *1 (Cal. Ct. App. 2015). Following a bifurcated court trial, defendant was found to have suffered a prior juvenile adjudication for a strike offense (Cal. Penal Code § 667(b)-(i)). Id.

Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth DCA"). The Fifth DCA affirmed the judgment on July 9, 2015. Id. Petitioner filed a petition for review in the California Supreme Court, and the petition was summarily denied on September 16, 2015. Id.

On March 24, 2016, Petitioner filed the instant petition for writ of habeas corpus in this Court. (Doc. No. 1). Respondent filed an answer on June 8, 2016. (Doc. No. 20). Petitioner did not file a traverse.

## II. FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the Fifth DCA's unpublished decision[1]:

> At approximately 2:30 a.m. on October 22, 2010, [N.3] Officer Gaona of the Madera Police Department was on patrol in a marked vehicle when he observed a red Toyota Corolla with no front license plate. The vehicle turned; Gaona noticed it also lacked a rear license plate. He activated his overhead light bar to initiate a traffic stop due to the Vehicle Code violations. The Toyota continued on for a little while, then yielded to the right side of the roadway.
>
> > [N.3] All dates in the statement of facts are from the year 2010.
>
> Gaona got out of his vehicle and approached defendant, who was the driver and only occupant of the Toyota. [N.4] Defendant provided identification and the vehicle registration at Gaona's request, then Gaona relayed some of that information to dispatch via radio. He particularly wanted to make sure the vehicle identification number on the registration matched what was on the car's front dash.
>
> > [N.4] The entire incident was recorded by Gaona's in-car camera. The video recording was played for the jury.
>
> Gaona observed a red metal pipe about two feet long and an inch and a half in diameter on the passenger side floorboard, with one end sticking out toward defendant. Gaona told defendant not to grab it and asked why he had it. Defendant said he found it in the roadway and wanted to use it for his weight bench. When

---

[1] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). Therefore, the Court will rely on the Fifth DCA's summary of the facts. Moses v. Payne, 555 F.3d 742, 746 (9th Cir. 2009).

2

Gaona asked how he was going to use it for a weight bench, defendant, who appeared to be searching for an answer, could not provide one.

Gaona, who was waiting for dispatch to get back to him with the requested information, grew cautious of defendant's actions. Defendant appeared to be very nervous and apprehensive about something. When he reached into the glove box to retrieve some paperwork, he leaned his left shoulder toward the right side of his body, then dropped his left hand toward his waist or the center console area. Out of concern for his own safety, Gaona directed defendant to put his hand on the steering wheel where Gaona could see it.

Defendant did as Gaona directed, but still appeared hesitant and nervous. Because of how defendant was acting, Gaona asked him to step out of the car due to safety concerns. Gaona directed defendant to face the V-shaped gap created by the open driver's door, but defendant tried to face Gaona. Gaona grabbed one of defendant's hands and guided him to face away from Gaona as defendant stepped out so defendant would not be in a position to lunge at the officer.

Gaona was able to get defendant to face the gap, then he grabbed both of defendant's hands and advised him that for officer's safety, he was going to conduct a pat search. Defendant said it was not necessary. Gaona said he was going to do it for safety purposes. At that point, Gaona had defendant's hands behind defendant's back, one in each of his own hands, and was putting them together. Defendant asked Gaona to release his hands so he could place the vehicle keys, which were in his left hand, in the car. Gaona, who was concerned defendant was trying to better position himself, told him just to drop the keys where they were at. Defendant dropped the keys, whereupon Gaona grabbed the fingers of both hands in Gaona's left hand and told defendant to spread his feet. Gaona then conducted a pat search with his right hand.

Gaona discovered a large K Bar knife through a belt loop on the right side of defendant's pants. [N.5] He directed defendant to leave it there and continued his search. As he started to search the left part of defendant's waist area, defendant pulled out of his grasp. Gaona immediately grabbed the knife with his right hand to make sure defendant did not try to pull it out, while with his left hand, he edged defendant toward the car and radioed for assistance. He told defendant to put his hands behind his back so Gaona could pat search him for officer safety, but defendant refused. He said he felt it was not necessary and he was not going to do it.

> [N.5] Such a knife is issued by the United States Marine Corps. Its overall length is approximately 10 inches, with the blade six or seven inches long.

After a few minutes, Gaona saw two patrol cars heading his direction. He shined his flashlight at them to let them know his location. Defendant also looked in their direction, then lunged into the car. Gaona, who was still holding onto the knife, grabbed defendant and tried to yank him out. Defendant grabbed the steering wheel and clawed his way into the car. Worried defendant was reaching for something in the center console area that had concerned Gaona originally, Gaona grabbed hold of defendant and jumped into the car with him. Defendant landed across the front seats, then Gaona jumped on top and dropped his weight onto defendant's body and tried to reach for his hands, which were underneath defendant.

Gaona kept telling defendant to put his hands behind his back and trying to grab

3

his arm to force it behind his back so he could handcuff defendant, but he was unsuccessful. When Officers Alva and Boehm arrived, Alva went through the front passenger-side door, while Boehm came through Gaona's side, the front driver's-side door. [N.6] Gaona told them defendant had a knife, whereupon Alva, who had been trying to get control of defendant's arm, began to strike defendant with her elbow in the head and neck area. If anything, it seemed like defendant started to fight harder. Boehm grabbed the knife, which was in a sheath on defendant's belt on his back, and tossed it out of the car.

> [N.6] Officer Palazzola arrived shortly after Alva and Boehm. Officer Yang arrived at about the same time as Palazzola.

Gaona was trying to grab at defendant's hand from underneath. As Gaona inched his hand up defendant's wrist and onto his hand, he realized defendant had a revolver in his left hand. Gaona felt the gun with his own hand, and yelled to the other officers that defendant had a gun. [N.7] Shortly after, Palazzola heard defendant yell, in a very angry tone of voice, that he had a gun. [N.8]

> [N.7] Because Gaona had been unable to complete the search of defendant's person, he could not tell whether the gun came from defendant's body or from inside the vehicle.

> [N.8] Gaona did not hear this. Alva recalled defendant looking up at her with "a really crazy look," and saying, "I've got a fucking gun," before Gaona made the announcement. The look was one of desperation, like he was really fighting to hurt them, and the tone of voice was very angry and aggressive. Alva struck defendant over the head with her Taser, causing the Taser cartridge to pop off.

Boehm reached underneath defendant to try to help Gaona. He could feel that the gun was tight against defendant's abdomen, but the barrel was pointed toward Boehm's groin. When Boehm lost his grip on the gun, he started hitting defendant in the lower back, trying to do anything to get defendant to let go of the gun. Meanwhile, Yang entered the car through the rear driver's-side door and attempted to assist Boehm by reaching for defendant's arms. When Yang could not reach for defendant's arms due to the limited amount of room in the vehicle, he began punching and elbowing defendant's lower back, through the space between the bucket seats, in an unsuccessful attempt to get him to surrender.

Hearing defendant had a gun, Palazzola decided the best course of action would be to shoot him, because Palazzola believed all the officers' lives were in imminent danger. He put his gun close to defendant's back and told Gaona he was going to shoot, but Gaona told him not to, because his arms were underneath defendant. Palazzola then tased defendant in the back. He cycled the Taser twice, with each cycle lasting about five seconds. Although defendant grunted like he was in pain, he did not stop struggling or give up the gun. Palazzola then directed the other officers to begin hitting defendant. Palazzola went to the front passenger side and started kicking defendant in the face or head. Palazzola was in fear for his life. Alva also began kicking defendant in the head. Boehm started elbowing defendant in the lower back. Yang reentered the vehicle and began punching and elbowing defendant in the lower back again, but to no avail.

As Gaona was trying to remove the gun from defendant's hand, he felt defendant forcefully trying to keep it, and to maneuver the gun as it was underneath the two of them. When Alva was kicking defendant, Gaona felt defendant make a very

4

forceful move of the gun in an upward direction, toward where Gaona's and defendant's heads and Alva were. Gaona kept telling defendant to let go of the gun and put his hands behind his back, but defendant did not respond or comply. Based on defendant's actions, Gaona felt defendant was trying to shoot Gaona or one of the other officers. Defendant was fighting to keep possession of the gun and also to maneuver it. [N.9]

> [N.9] Gaona and Boehm described the movement of the gun with reference to the face of a clock. When Boehm first felt the gun, the barrel was pointing toward the driver's-side door, in the number 6 position. According to Gaona, the gun initially was pointing toward the number 3 position, which was toward the right side of Gaona's body. At the time defendant made the surge, Gaona felt the barrel move toward the number 2 position. Yang, who was in the rear driver's seat of the car, was in the number 3 position. Palazzola, who was in the rear passenger's seat, was between the number 1 and number 2 positions. Alva, who was at the front passenger-side door, was in about the number 12 position. Gaona's head was also pointing toward the number 12 position.

When the kicks to defendant's head were not effective in getting defendant to release the gun, Alva touch-tased defendant's neck. [N.10] Defendant yelled, at which point Gaona was able to pull the gun from his grasp. It was a Smith and Wesson .38–caliber revolver containing six bullets, meaning it was fully loaded. The gun subsequently was determined to be operable.

> [N.10] When Palazzola used his Taser, the device shot two probes that were designed to stick into a person's body. In Alva's case, the cartridge that projected the probes had come off, allowing two metal prongs at the end of the Taser to emit an electrical discharge directly in contact with defendant's skin.

Defendant refused to comply with Gaona's orders to put his hands behind his back, and physically resisted Gaona's and Alva's attempts to gain control of his hands. Ultimately, Gaona performed an elbow strike on defendant's back, after which Gaona was able to handcuff defendant. Alva and Palazzola then pulled defendant out of the car and laid him on the ground, and Palazzola searched him. Palazzola found a round of .223–caliber ammunition in one of defendant's pants pockets. In the Toyota's trunk were three clips containing a total of 30 rounds of .223–caliber ammunition, and two empty clips.

Defendant was taken to the hospital for medical clearance before being booked into jail. Boehm was with him the entire time there. Defendant said nothing, but his demeanor gave the impression he was depressed, angry, and pouting about having lost his battle with the officers.

Sometime later, defendant was mistakenly released from jail. On October 27, a four-officer team responded to Oakhurst, where defendant lived, in an attempt to reapprehend him. Defendant, who was standing next to the red Toyota in a supermarket parking lot, was taken into custody without incident. Two live 12–gauge shotgun shells were found in his pocket.

Defendant directed the officers to the property where he was residing, which was fairly secluded. The location had a primary residence with a large, dilapidated building next to it. As the officers were walking up the driveway, they contacted Ramon Morales, defendant's father, coming out of the primary residence. Upon

5

being informed defendant had given consent to search his (defendant's) bedroom, Morales directed them to that location, which was in the large building. A box of .243–caliber ammunition was found inside the structure. Asked if he had any weapons at the house, particularly anything .243–caliber or 12–gauge, Morales replied he did not. Morales said all he owned were two .22–caliber rifles, one of which was inoperable. He showed the officers the rifles and gave them permission to search his residence. No other firearms or ammunition were found in the primary residence.

There were several vehicles parked up the hill on the property. Morales said all belonged to him. Officer Harlow walked up to one of the vehicles—a Chevrolet S-10 pickup—and observed a stack of weapons on the seat through the driver's window. Morales said the weapons did not belong to him, and he did not know how they got in the truck or why they were in there. He told Harlow to go ahead and take them.

As Harlow opened the door to the pickup, he heard a noise and saw defendant, who was handcuffed, running away. [N.11] The officers gave chase, but defendant disappeared. The ensuing manhunt was unsuccessful. However, in defendant's wallet (which had been seized when he was searched incident to the arrest) was a handwritten agreement selling the pickup to defendant. According to Morales, it was defendant's pickup; no one else drove it.

> [N.11] Defendant had been transported to the location in a patrol vehicle. Because the vehicle had to get back into service, defendant was moved to an undercover vehicle that did not have an enclosed cage and in which the back doors could be opened merely by using the handle. Although an officer had been left in charge of keeping an eye on defendant, the officer had come over to Harlow's location to look at the guns.

Harlow subsequently inventoried the weapons taken from the truck. There was a 7.62–caliber SKS assault rifle, a .223–caliber AR–15 receiver, a Ruger mini 30 rifle, a Charles Daley pump action 12–gauge shotgun, and a Montgomery Ward .243–caliber rifle. There was also an assortment of magazines, ammunition (including .38–, .223–, and 7.62–caliber), and knives, as well as three shurikens (Ninja or throwing stars).

Defendant turned himself in several months later.

Morales, 2015 WL 4141840, at *1–5.

## III.     DISCUSSION

### A.     Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged conviction arises out of the Madera

6

County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.  Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-406).

In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an unreasonable application of federal law is different from an incorrect application of federal law.'" Cullen v. Pinholster, 563 U.S. 170, 203 (2011). Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in

7

existing law beyond any possibility of fairminded disagreement." Harrington, 562 U.S. at 103.

The second prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997). A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), *cert.denied*, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

C. Review of Claim

Petitioner contends that the evidence was insufficient to support his convictions. Specifically, he argues that his conduct did not rise to the level of an assault as to counts 1 through 5, and he claims that there was no evidence that he was aware of Officer Yang's presence to sustain counts 6 through 10. Petitioner presented this claim on direct review. The Fifth DCA rejected the claim, as follows:

> Defendant challenges the sufficiency of the evidence to sustain his convictions on counts 1 through 5 and 10, and the trial court's determination his juvenile adjudication constituted a strike. The applicable legal principles are settled. The

8

test of sufficiency of the evidence is whether, reviewing the whole record in the light most favorable to the judgment below, substantial evidence is disclosed such that a reasonable trier of fact could find the essential elements of the crime or sentence allegation beyond a reasonable doubt. (*People v. Delgado* (2008) 43 Cal.4th 1059, 1067; *People v. Johnson* (1980) 26 Cal.3d 557, 578; *People v. Roberts* (2011) 195 Cal.App.4th 1106, 1132–1133; accord, *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) Substantial evidence is that evidence which is "reasonable, credible, and of solid value." (*People v. Johnson, supra*, 26 Cal.3d at p. 578.) An appellate court must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Reilly* (1970) 3 Cal.3d 421, 425.) An appellate court must not reweigh the evidence (*People v. Culver* (1973) 10 Cal.3d 542, 548), reappraise the credibility of the witnesses, or resolve factual conflicts, as these are functions reserved for the trier of fact (*In re Frederick G.* (1979) 96 Cal.App.3d 353, 367). This standard of review is applicable regardless of whether the prosecution relies primarily on direct or on circumstantial evidence. (*People v. Lenart* (2004) 32 Cal.4th 1107, 1125.)

# I
## *The Substantive Offenses*

Defendant contends his convictions on counts 1 through 5 (assault with a firearm on each officer present) must be reversed because his conduct did not rise to the level of an assault. He argues the police intervened before it was known whether his lunging into the car and grabbing the gun would develop into assaultive behavior. He says he may only have been trying to hide the gun, and it was "extremely unlikely" his movement of the weapon was volitional. Defendant further contends his convictions on counts 5 and 10 (assault with a firearm on a peace officer and resisting an executive officer, respectively, both with Yang the named victim) must be reversed because there was no evidence he was aware of Yang's presence. We reject these claims.

Subdivision (d)(1) of section 245 prescribes the punishment for "[a]ny person who commits an assault with a firearm upon the person of a peace officer ..., and who knows or reasonably should know that the victim is a peace officer ... engaged in the performance of his or her duties, when the peace officer ... is engaged in the performance of his or her duties...."

"An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) "An assault is an incipient or inchoate battery; a battery is a consummated assault." (*People v. Colantuono* (1994) 7 Cal.4th 206, 216.) Assault is a general intent crime (*People v. Williams* (2001) 26 Cal.4th 779, 788 (*Williams*)); it "does not require a specific intent to injure the victim. [Citation.]" (*Ibid*.) The "mens rea is established upon proof the defendant willfully committed an act that by its nature will probably and directly result in injury to another, i.e., a battery." (*People v. Colantuono, supra*, 7 Cal.4th at p. 214.) "[I]t is a defendant's action enabling him to inflict a present injury that constitutes the actus reus of assault. There is no requirement that the injury would necessarily occur as the very next step in the sequence of events, or without any delay.... 'There need not even be a direct attempt at violence; but any indirect preparation towards it, ... such as drawing a sword or bayonet, or even laying one's hand upon his sword, would be sufficient.' [Citation.]" (*People v. Chance* (2008) 44 Cal.4th 1164, 1172.) "One may commit an assault without making actual physical contact with the person of the victim; because the statute focuses on use of a [firearm] ..., whether the victim in fact suffers any harm is immaterial.

9

[Citation.]" (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028.)

We have set out the evidence adduced at trial, *ante*, and need not repeat it. The testimony of the various officers concerning defendant's actions and demeanor were sufficient to permit a rational trier of fact to infer defendant grabbed the gun and volitionally sought to move it in order to use it against the officers, and thereby committed assault with a firearm on each of them.

"'Once a defendant has attained the means and location to strike immediately he has the "present ability to injure." The fact an intended victim takes effective steps to avoid injury has never been held to negate this "present ability."' [Citations.]" (*People v. Chance, supra*, 44 Cal.4th at p. 1174.) Here, defendant's grabbing a fully loaded firearm and maneuvering it in close quarters with the officers "gave him the means and the location to strike 'immediately' at [those officers], as that term applies in the context of assault." (*Id.* at pp. 1175–1176.) When, as the testimony in the present case reasonably established, "a defendant equips and positions himself to carry out a battery, he has the 'present ability' required by section 240 if he is capable of inflicting injury on the given occasion, even if some steps remain to be taken, and even if the victim or the surrounding circumstances thwart the infliction of injury." (*Id.* at p. 1172.)

We recognize jurors could have concluded defendant was merely attempting to hide the gun and/or that his movement of it was not volitional. This does not render the evidence insufficient to sustain the convictions on counts 1 through 5, however. "Where the circumstances support the trier of fact's finding of guilt, an appellate court cannot reverse merely because it believes the evidence is reasonably reconciled with the defendant's innocence. [Citations.]" (*People v. Meza* (1995) 38 Cal.App.4th 1741, 1747.)

Defendant says the evidence nevertheless failed to show he was aware of Yang's presence; hence, the convictions on counts 5 and 10 must be reversed. With respect to the violation of section 245, subdivision (d)(1) of which he was convicted in count 5, he points primarily to the following passage in *Williams, supra*, 26 Cal.4th at pages 787–788:

> "[A] defendant is only guilty of assault if he intends to commit an act 'which would be indictable [as a battery], if done, either from its own character or that of its natural and probable consequences.' [Citation.] Logically, a defendant cannot have such an intent unless he actually knows those facts sufficient to establish that his act by its nature will probably and directly result in physical force being applied to another, i.e., a battery. [Citation.] In other words, a defendant guilty of assault must be aware of the facts that would lead a reasonable person to realize that a battery would directly, naturally and probably result from his conduct. He may not be convicted based on facts he did not know but should have known. He, however, need not be subjectively aware of the risk that a battery might occur." (Fn. omitted.)

With respect to the violation of section 69 of which he was convicted in count 10, defendant says an accused must "'knowingly resist[ ]'" (*People v. Smith* (2013) 57 Cal.4th 232, 241 (Smith )) and must have "'a specific intent to interfere with the executive officer's performance of his duties....' [Citations.]" (*People v. Nishi* (2012) 207 Cal.App.4th 954, 967 (*Nishi*).) [N.12]

[N.12] Section 69 prescribes the punishment for "[e]very person who

10

attempts, by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed upon such officer by law, or who knowingly resists, by the use of force or violence, such officer, in the performance of his duty...." The statute "'sets forth two separate ways in which an offense can be committed. The first is attempting by threats or violence to deter or prevent an officer from performing a duty imposed by law; the second is resisting by force or violence an officer in the performance of his or her duty.' [Citation.]" (*Smith, supra*, 57 Cal.4th at p. 240.) The first way does not require the actual use of force or violence. (*Ibid*.)

Defendant quotes from a portion of *Smith* that deals with the second way of violating section 69. The jury here was instructed only on the first way. Since *Nishi* dealt with the first form of a violation of section 69, however, this discrepancy does not affect defendant's argument or our analysis.

A number of cases inform our conclusion the evidence was sufficient to sustain the convictions on counts 5 and 10.

In *People v. Lee* (1994) 28 Cal.App.4th 1724, the defendant was convicted of attempted murder of Young, at whom he shot, and assault with a firearm on Green, who was one of Young's companions. (*Id*. at p. 1728.) In upholding the assault conviction, the Court of Appeal found the evidence undisputed Lee was aware of the presence of the group (which included Green) who were near Young, and found the jury reasonably could conclude the defendant intended to harm not only Young, but also some or all of his companions. (*Id*. at pp. 1735–1736.) The court noted that because assault with a firearm is a general intent crime, "a defendant need not intend to commit violence against a specific victim to be guilty of an assault. [Citations.]" (*Id*. at p. 1736.)

In *People v. Tran* (1996) 47 Cal.App.4th 253 (*Tran*), the defendant chased a man with a knife. The man was holding a baby. The defendant was convicted of two counts of assault with a deadly weapon. (*Id*. at pp. 257, 261.) In upholding the conviction for assault on the baby, the Court of Appeal read *People v. Colantuono*, *supra*, 7 Cal.4th 206, "to mean that an intent to do an act which will injure any reasonably foreseeable person is a sufficient intent for an assault charge." (*Tran, supra*, at p. 262.)

In *People v. Raviart* (2001) 93 Cal.App.4th 258, Officers Keller and Wagstaff separated as they approached defendant in an attempt to arrest him outside his motel room. As Keller came around the corner, he saw defendant pointing a handgun directly at him. He also heard Wagstaff yell "'Gun.'" Both officers fired at the defendant. (*Id*. at pp. 264–265.) In rejecting the defendant's claim he could not be convicted of assault with a firearm on Wagstaff because he only pointed the gun at Keller (*id*. at p. 262), the Court of Appeal stated: "[T]he jury could have found beyond a reasonable doubt that when defendant was confronted by the two police officers outside the motel, he drew a loaded handgun ... with the intent to shoot both officers, but he only managed to point it at one of the officers before they both shot him. By drawing the gun with the intent to shoot the officers, defendant performed an overt act sufficient to constitute an assault on both of them. Defendant did not have to perform the further act of actually pointing the gun directly at Officer Wagstaff to be guilty of assaulting Wagstaff. It was enough that defendant brought the gun into a position where he could have used it against Wagstaff if the officers had not shot him first." (*Id*. at p. 266.)

11

In *People v. Hayes* (2006) 142 Cal.App.4th 175, the defendant resisted his probation officer's attempt to arrest him for a probation violation. When other officers arrived to assist, the defendant kicked a concrete ashtray that was next to one of them, knocking it over and striking the officer in the shin. (*Id*. at p. 179.) The defendant was convicted of battery with injury on the officer. (*Id*. at p. 178.) The Court of Appeal upheld the conviction, stating: "Substantial evidence supports the jury's implied finding that appellant had the required mental state for battery. A reasonable trier of fact could find beyond a reasonable doubt that appellant intentionally kicked the ashtray with great force knowing [the probation officer] was standing beside the ashtray. Based on these findings, a reasonable trier of fact could further find beyond a reasonable doubt that appellant knew facts sufficient to establish that his intentional act 'would directly, naturally and probably result in a battery' by causing the ashtray to fall on [the officer]. [Citation.] Appellant concedes that he intentionally kicked the ashtray with the purpose of knocking it over. It is of no consequence whether he may have honestly believed that his intentional act was unlikely to result in a battery. [Citation.]" (*Id*. at p. 180.)

In *Williams, supra*, 26 Cal.4th 779, the defendant fired a shot at King's truck, knowing King was crouched approximately 18 inches away from the rear of the vehicle. The defendant testified he never saw King's sons before he fired, and only noticed them afterwards standing on a curb outside the immediate vicinity of King's truck. King, on the other hand, testified both boys were getting into the truck when the defendant fired. The jury convicted the defendant of assaulting King with a firearm, but deadlocked on charges he assaulted the boys with a firearm and shot at an occupied motor vehicle. (*Id*. at pp. 782–783.) The California Supreme Court held that while assault does not require a specific intent to cause injury or a subjective awareness of the risk an injury might occur, it requires "an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another." (*Id*. at p. 790.) In light of that requirement, the court found erroneous an instruction that merely required the jury to find the defendant willfully and unlawfully committed an act that, by its nature, would probably and directly result in physical force being applied to the person of another, because it could permit a conviction premised on facts the defendant should have known but did not actually know. (*Ibid*.) The court found the instructional error harmless in light of the defendant's admission he knew King's whereabouts and the jury's deadlock on the counts in which the defendant denied actual knowledge that the victims were near the vehicle when he fired. (*Ibid*.)

In *People v. Miller* (2008) 164 Cal.App.4th 653, the defendant drove her car onto a bicycle path, causing people to have to jump out of the way. Eventually, she struck a jogger, then drove a little farther before stopping. Upon emerging from her vehicle, the defendant said, "'I didn't see him.'" An officer described her as incoherent, dazed, and unsure where she was or what had happened. Her personal physician testified she suffered from a longstanding medical condition that could have caused disorientation. (*Id*. at pp. 658–659, 664.) In instructing on the charge of assault with a deadly weapon, the trial court told the jury, in part, that the person committing the act had to be aware of facts that would lead a reasonable person to realize that as a direct, natural, and probable result, physical force would be applied to another person. In response to a question from the deliberating jury, however, the court said there was no "'"awareness"'" element. (*Id*. at p. 661.) The Court of Appeal found "clear error" under *Williams* (*People v. Miller, supra*, at p. 663), and found the error prejudicial because the jury could have believed the defendant was unable accurately to perceive her surroundings due to a condition not caused by voluntary intoxication, and so could have concluded she was

12

unaware of facts that would lead a reasonable person to realize that battery would directly, naturally and probably result from her conduct (*id*. at p. 664).

In *People v. Riva* (2003) 112 Cal.App.4th 981 (*Riva*), the defendant fired a gun from inside his car at the occupants of a vehicle, missing his intended targets but wounding a pedestrian. (*Id*. at p. 986.) The Court of Appeal found the instruction on assault with a deadly weapon defective under *Williams*, but concluded the error was harmless beyond a reasonable doubt because the shooting took place in an urban neighborhood consisting of residences and small businesses, at a time of day when people were normally returning home from work, school, or shopping, and there were other pedestrians and numerous vehicles in the area when the shooting occurred. Those facts, the court reasoned, "would lead a reasonable person to realize if he fired a gun at someone in a car at this time of day in this kind of neighborhood the bullet could strike a pedestrian and a battery would directly, naturally and probably result from his conduct." (*Riva, supra*, at p. 998, fn. omitted.) The court further held that "even under [*Williams's*] 'actual knowledge' test when the defendant shoots into a crowd the People do not have to prove he was aiming at a particular target." (*Ibid*.) "The defendant need not intend to strike any particular person to be guilty of [assault with a deadly weapon]. Rather, when the defendant shoots into a group of persons primarily targeting only one of them, the defendant can be convicted of assault with a deadly weapon as to the nontargeted members of the group." (*Id*. at p. 999, fns. omitted.)

In *People v. Felix* (2009) 172 Cal.App.4th 1618 (*Felix*), the defendant contended the evidence was insufficient to support his convictions for assault with a firearm on his girlfriend's school-age brother and sister. (*Id*. at pp. 1627, 1630.) The Court of Appeal found the statement in *Tran*, that an intent to do an act that will injure any reasonably foreseeable person is a sufficient intent for an assault charge, to be valid under *Williams*. (*Felix, supra*, at p. 1628.) The court rejected the defendant's attempt to distinguish cases such as *Tran* and *Riva* as involving secondary victims whose presence was readily apparent to the perpetrator, explaining: "[N]o subjective intent to injure a particular victim is required. Rather, a defendant's intended acts are evaluated objectively to determine whether harm to a charged victim was foreseeable. [Citation.]" (*Felix, supra*, at p. 1629.) The court continued: "While not every shooting into a car or building will satisfy the 'actual knowledge' requirement of *Williams*, here [the defendant] had detailed, intimate knowledge of the house and inhabitants. He *actually knew* he was endangering the lives of three or more members of the family when he fired into the house.... The evidence is sufficient to support the jury's implied finding that [the defendant] knew it was highly likely that [the victims] were in the house at the time he fired the gunshots. He thus knew that his acts would 'probably and directly result in physical force' against them. [Citation.]" (*Id*. at p. 1630.)

In *People v. Trujillo* (2010) 181 Cal.App.4th 1344, the defendant fired several shots at a car that had tinted windows. On appeal, he contended the evidence was insufficient to convict him of two counts of assault, because he had no knowledge there was a passenger in the backseat of the car. (*Id*. at pp. 1347–1349.) Relying largely on *Felix*, *Riva*, and "zone of harm" or "kill zone" cases such as *People v. Bland* (2002) 28 Cal.4th 313 (*Bland*), *People v. Vang* (2001) 87 Cal.App.4th 554 (*Vang*), and *People v. Adams* (2008) 169 Cal.App.4th 1009 (*Adams*), the court stated:

> "[A] defendant who harbors the requisite mental state for assault while committing one or more acti rei such that a direct, natural, and probable result is a battery against two persons may be convicted of assault against

13

each. Here, there is no dispute that the firing of multiple gunshots from a semiautomatic weapon at [a vehicle] is an 'action [or are actions] enabling him to inflict a present injury' on anyone inside [that vehicle], thus constituting an actus reus or multiple acti rei of assault. [Citation.] Nor is it reasonably disputed that defendant had the requisite mental state for assault required by Williams: he was actually aware that he was shooting at an occupied car in a manner that would lead a reasonable person to realize that a battery against another would directly, naturally, and probably result. [Citation.] Even if he was not actually aware of the second person in the [vehicle], his mental state can be 'readily combine[d]' with the actus reus (or acti rei) of shooting at the car with two people inside to '"multiply the criminal acts for which the [defendant] is responsible."' [Citation.] Just as 'a person maliciously intending to kill is guilty of the murder of all persons actually killed' [citation], *a person who harbors the requisite intent for assault is guilty of the assault of all persons actually assaulted*. [Citations.]

"Because the gravamen of assault is the likelihood that the defendant's action will result in a violent injury to another [citations], it follows that a victim of assault is one for whom such an injury was likely. [The person] sitting in the backseat of the [vehicle] nearest to defendant's fusillade of gunshots, was no less a victim of defendant's assault than the driver.... Therefore, defendant can be charged with and convicted of assault against both occupants of the car even if defendant did not actually see [the person] in the backseat.

"Support for this view can be found in cases involving acts of violence that create a zone of harm encompassing multiple potential victims. [Citations.] ... [¶] ... [¶]

"*Vang* and *Adams* involved attempted murder convictions, not assault. Nevertheless, if the defendants in *Vang* and *Adams* harbored the specific intent to kill people inside buildings when they were unaware that such persons were in the buildings, it would be absurd to find that they did not also have the mental state required to be convicted of assault against those same victims; the specific intent to kill everyone in a building by shooting them (*Vang*) or burning them (*Adams*) necessarily includes an awareness of facts (shooting into or burning an occupied residence) such that a reasonable person would realize a battery against such persons would directly, naturally, and probably result from his or her conduct. Here, defendant had the requisite mental state for assault and essentially created a zone of harm inside the [vehicle] when he shot a flurry of bullets at it....

"Even if the 'elastic' mens rea concept described by *Bland* or the kill zone theory does not apply here, we would conclude that [the backseat passenger] was a reasonably foreseeable victim of defendant's assault under the rationale expressed in *Felix* and *Riva*. The jurors could have reasonably found that a person with actual knowledge that he is shooting indiscriminately at a moving vehicle would realize that his conduct would directly, naturally, and probably result in a battery to anyone and everyone inside the [vehicle]. Passengers in cars are no less foreseeable than the pedestrian who was hit in *Riva*." (*People v. Trujillo, supra*, 181 Cal.App.4th at pp. 1354–1357, fns. and original italics omitted, italics added.)

In *People v. Velasquez* (2012) 211 Cal.App.4th 1170, this court considered a case

14

in which the defendant, who shot at a garage 10 times, was charged with a count of assault with a firearm for each person inside the residence at the time of the shooting. On appeal, the defendant conceded he had no grounds to challenge the count involving Maria, who was inside the garage, but he claimed the remaining four counts had to be reversed because the instructions improperly allowed the jury to convict him of those counts simply because Maria was at risk of being struck by a bullet. (*Id*. at p. 1175.) While noting evidence supported but did not compel a conclusion no one but Maria was in any danger, we agreed with the defendant that the instructions and arguments of counsel did not clarify the requirement that each victim must have been subject to the application of force, or explain to the jury that it must conclude beyond a reasonable doubt that the bullets fired by the defendant would directly and probably result in application of force to the victim named in each count. (*Id*. at p. 1177.)

None of the foregoing cases is directly on point. Some antedate *Williams*, and many involve situations in which a gun actually was fired. Nevertheless, our consideration of them leads us to conclude that, under the circumstances shown by the evidence in this case, defendant did not have to be aware that his acts by their nature would probably and directly result in physical force being applied specifically to Yang. Similarly, he did not have to knowingly resist Yang or have a specific intent to interfere with Yang's performance of his duties. The evidence was sufficient to sustain the convictions on counts 5 and 10 because it reasonably gave rise to the inference (1) defendant was aware of Yang's presence, in the sense he knew another officer was there, because Yang punched and elbowed defendant multiple times on two separate occasions [N.13]; (2) defendant intended to fight with, resist, and interfere with *any and all* of the officers present, and (3) given the close confines of the car and defendant's knowledge he had his hand on a loaded firearm, was engaged in a struggle with multiple peace officers, and was attempting to maneuver the gun, he was aware of the facts that would lead a reasonable person to realize a battery would directly, naturally and probably result from his conduct to *each* of the officers present.

> [N.13] As the trial court observed in denying defendant's section 1118.1 motion, "And while inside the vehicle, [Officer Gaona] discovers that the defendant has a firearm. And it is ... the existence of that firearm, a loaded firearm, and apparently an operable firearm, that places all persons in proximity—and I would say, then, all persons within that Toyota vehicle during the course of the struggle—at risk of serious injury or death arising out of the possible discharge of that firearm. [¶] [Defendant] was, in fact, aware of the presence of Officer Yang. He may not have known it by name, he may not have known it by sight, but Officer Yang mentioned that Officer Yang was one of the officers who struck at the defendant at the time. So the defendant was certainly aware that there was someone there. Whether he knew it was Officer Yang as a person who he could take notice of in a crowd and separate that from others, he still knew that there was a person there."

Morales, 2015 WL 4141840, at *5–10.

### a. Legal Standard

The law on sufficiency of the evidence is clearly established by the United States Supreme Court. Pursuant to the United States Supreme Court's holding in Jackson v. Virginia, 443 U.S.

15

307 (1979), the test on habeas review to determine whether a factual finding is fairly supported by the record is as follows: "[W]hether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990). Thus, only if "no rational trier of fact" could have found proof of guilt beyond a reasonable doubt will a petitioner be entitled to habeas relief. Jackson, 443 U.S. at 324. Sufficiency claims are judged by the elements defined by state law. Id. at 324, n. 16.

If confronted by a record that supports conflicting inferences, a federal habeas court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326. Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction. Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).

After the enactment of the AEDPA, a federal habeas court must apply the standards of Jackson with an additional layer of deference. Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). In applying the AEDPA's deferential standard of review, this Court must presume the correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986).

In Cavazos v. Smith, 565 U.S. 1 (2011), the United States Supreme Court further explained the highly deferential standard of review in habeas proceedings, by noting that Jackson

> makes clear that it is the responsibility of the jury - not the court - to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable."
>
> Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.

Id. at 3-4.

        b. <u>Analysis</u>

In this case, the state court applied the <u>Jackson</u> standard; therefore, the only question is whether the state court's application was objectively unreasonable. <u>Id</u>.

The state court set forth the statutes defining assault (Cal. Penal Code §§ 240, 245) and determined that the evidence satisfied each element. Petitioner argues that his actions maneuvering the gun in a close quarters struggle with officers did not rise to the level of an assault. However, the state court found that such actions were sufficient as a matter of law. The court noted that an assault does not require a specific intent to injure, but in this case, there was evidence from which a jury could infer that Petitioner intended to injure the officers. The court noted that under California law, there is no requirement that injury occur or that there was a direct attempt at violence; however, any indirect preparation toward it, such as drawing a weapon or even laying one's hand on a weapon would be sufficient.

Here, Petitioner violently struggled with officers over the gun and resisted every attempt by the officers to seize it. The evidence also showed that Petitioner jerked the weapon in different directions against the officers' will. From this, the jury could infer that Petitioner was attempting to maneuver the gun in order to fire it at the officers. Petitioner certainly had the present ability to immediately fire at the officers if physically permitted. From the evidence, a rational trier of fact could conclude that Petitioner struggled with the officers over the weapon in order to fire at the officers. This was sufficient under California law to establish an assault.

Concerning Petitioner's allegation that he did not know the identity of Officer Yang such that an assault could not have been committed against him, the state court determined that under California law it was not necessary to know the identity or the presence of Officer Yang. Contrary to Petitioner's argument, the Fifth DCA interpreted Cal. Pen. Code § 245 and found no requirement of such specific knowledge of each of the victims. It was sufficient that Petitioner knew of the group of officers he was struggling with and that his acts would probably and directly result in physical force against them. The state court noted that "a person who harbors the requisite intent for assault is guilty of the assault of all persons actually assaulted." <u>Morales</u>, 2015 WL 4141840, at 18. Under California law, this also includes any reasonably foreseeable

17

person. Officer Yang was one of the officers who struggled with Petitioner. It was not necessary that Petitioner actually knew the identity or location of Officer Yang. It was sufficient that he was a member of the group Petitioner was aware of, and that he was a reasonably foreseeable target of a battery Petitioner intended to commit. This Court is bound by a state court's construction of its own statutes. Estelle, 302 U.S. at 67-68; Aponte v. Gomez, 993 F.2d 705, 707 (9th Cir. 1993); Oxborrow v. Eikenberry, 877 F. 2d 1395, 1399 (9th Cir. 1989). A fair-minded jurist could conclude that sufficient evidence supported Petitioner's conviction of the various charges. The claim and petition should be denied.

## IV. RECOMMENDATION

Accordingly, the Court **RECOMMENDS** that the Petition for Writ of Habeas Corpus be **DENIED** with prejudice on the merits.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within twenty-one days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the Objections shall be served and filed within ten court days after service of the Objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: **April 19, 2017**         **/s/ Jennifer L. Thurston**
UNITED STATES MAGISTRATE JUDGE